IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 24, 2023 Session

## STATE OF TENNESSEE v. ALBERT FRANKLIN THOMPKINS, JR.

**Appeal from the Criminal Court for Knox County**
**No. 120017     Hector I. Sanchez, Judge**

————————————————————

**No. E2023-00209-CCA-R3-CD**

————————————————————

A Knox County jury convicted the Defendant, Albert Franklin Thompkins, Jr., of two counts of aggravated sexual battery and two counts of rape of a child. The trial court sentenced the Defendant to an effective sentence of thirty-three years. On appeal, the Defendant argues that the evidence is legally insufficient to support his convictions. He also asserts that the trial court (1) violated "the spirit" of *Batson v. Kentucky*, 476 U.S. 79 (1986), when an African American juror was randomly selected and excused as an alternate juror at the end of trial; and (2) erred in failing to grant a mistrial and a motion for a new trial when defense witnesses failed to appear despite being subpoenaed to testify. Upon our review, we respectfully affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

George Edward S. Pettigrew, Knoxville, Tennessee, for the appellant, Albert Franklin Thompkins, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley D. McDermott and Heather Good, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

# FACTUAL BACKGROUND

In 2019, M.B.[1] lived in Knox County with her mother, stepfather, and little brother. She was thirteen years old at the time of trial in November of 2022, and she was between ten and twelve years old during the time of the offenses giving rise to this case.

The Defendant lived two doors down from M.B. He lived with Ruth Ann Sharp and their four daughters. M.B.'s mother worked full time, so M.B. would frequently go to the Defendant's house to play with their children. When the COVID-19 pandemic started, M.B. spent more time at the Defendant's house due to virtual schooling. Eventually, Ms. Sharp returned to work, frequently leaving the Defendant as the only adult in the house.

Later at trial, M.B. testified that she was sexually assaulted or raped by the Defendant as many as twenty times over a three-year period. As is relevant to this case, she identified four separate events. First, she testified that she was about ten years old the first time the Defendant touched her breasts. She testified that on a second occasion, the Defendant touched her "privates" over her clothes when she was between ten and twelve years old. This incident occurred when the Defendant lifted her shirt while wrestling and "messing with [her]."

Third, M.B. testified that, when she was almost eleven years old, the Defendant pulled her shirt up and pants down, and put his mouth on her breast and "down there where [she] pee[s]." Finally, M.B. said that, during this same time, the Defendant touched her breasts and exposed his penis. He also put his mouth on her "private area."

M.B. did not tell anyone about the Defendant's abuse until June of 2021, approximately two years after the first occurrence. After telling her mother what had happened, M.B.'s mother took her to East Tennessee Children's Hospital, where two police officers spoke with her. M.B. told the police that the Defendant had been touching her.

The police spoke with the Defendant multiple times, and he admitted to knowing M.B. and having frequent contact with her. The Defendant initially denied being alone with M.B. and all allegations against him. However, he later admitted that he was consistently alone with M.B. and that he had touched her vagina outside her clothing.

---

[1] It is the policy of this Court to identify the victims of sexual offenses only by their initials.

As is relevant to this case, a Knox County grand jury charged the Defendant with two counts of aggravated sexual battery and two counts of rape of a child occurring between 2019 and 2021. The trial began on November 8, 2022.

After its proof, the State made an election with respect to each count.[2] As to Count 1 alleging aggravated sexual battery, the State elected when the Defendant touched M.B.'s breasts under her clothes when she was ten years old. For Count 2 alleging aggravated sexual battery, the State elected the incident where the Defendant touched her vagina over her clothing with his hand when she was between ten and twelve years old. As to Count 3 alleging rape of a child, the State elected when the Defendant put his mouth on M.B.'s vagina when she was between ten and twelve years old. And for Count 4 alleging rape of a child, the State elected a separate incident when the Defendant exposed himself and put his mouth on M.B.'s vagina when she was between ten and twelve years old. Following the trial, the jury found the Defendant guilty as charged on each count.

The trial court held a sentencing hearing on January 12, 2023. The court imposed a sentence of eight years for each aggravated sexual battery conviction and a sentence of twenty-five years for each rape of a child conviction. Through ordering partial consecutive sentences, the court imposed an effective sentence of thirty-three years to be served in the Tennessee Department of Correction.

On November 15, 2022, the Defendant filed a motion for a new trial. The trial court denied the motion on January 13, 2023, and the Defendant filed a timely notice of appeal twenty-five days later.

**ANALYSIS**

In this appeal, the Defendant first argues that the evidence is legally insufficient to support his convictions. He also asserts that the trial court (1) violated "the spirit" of *Batson v. Kentucky*, 476 U.S. 79 (1986), when an African American juror was randomly selected and excused as an alternate juror at the end of trial; and (2) erred in failing to grant

---

[2]     The grand jury also charged the Defendant with one additional count each of aggravated sexual battery and rape of a child. However, the State dismissed these two counts prior to trial, and they are not at issue in this appeal.

Following the dismissal, and with the agreement of the parties, the trial court renumbered the counts of the presentment before submitting them to the jury. This was a permissible procedure to ensure that the jury was unaware of other criminal offenses with which the Defendant was originally charged. *See State v. Bullock*, No. E2021-00661-CCA-R3-CD, 2022 WL 3012460 (Tenn. Crim. App. July 29, 2022), *no perm. app. filed*. The jury returned its verdicts referencing the counts as instructed by the trial court. For clarity, we use these renumbered counts in our analysis.

a mistrial and a motion for a new trial when defense witnesses failed to appear despite being subpoenaed to testify. We address each of these issues in turn.

## A. LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence is legally insufficient to support his convictions for aggravated sexual battery and rape of a child. The Defendant claims specifically that the victim lacked credibility because she waited two and a half years to report these offenses. Due to the delay in reporting, the Defendant alleges that no reasonable person could find that these crimes occurred beyond a reasonable doubt. In response, the State argues that the proof is sufficient for conviction. We agree with the State.

### 1. Standard of Appellate Review

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, this standard requires us to resolve all conflicts in favor of the State's theory and to view the credited testimony in a light most favorable to the State. *State v. McKinney*, 669 S.W.3d 753, 772 (Tenn. 2023). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (internal quotation marks and citation omitted).

### 2. Aggravated Sexual Battery and Rape of a Child

In Counts 1 and 2, the Defendant was convicted of two counts of aggravated sexual battery. As charged in this case, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant," and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4) (2018). "Sexual contact" is defined as "the intentional touching of

the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39-13-501(6) (2018).

In Counts 3 and 4, the Defendant was also convicted of two counts of rape of a child. As charged in this case, rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2018) (since amended). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7).

The Defendant does not contest the sufficiency of the proof establishing any specific element of his convictions. Instead, the Defendant asserts that the "State's theory and proof depended upon the jury's finding that the testimony of the minor victim, M.B., was credible." He also asserts that the victim could not have been viewed as credible because, he alleges, a ten- to twelve-year-old child would not have waited years before telling anyone that she had been assaulted.

In essence, the Defendant's argument is an invitation to reweigh the evidence or to disturb the jury's determinations on appeal. We respectfully decline to do so, particularly in light of the standard of appellate review. When we review the legal sufficiency of the convicting evidence, the law requires us to look at all the evidence and to accredit the testimony of the State's witnesses when doing so. *Shackleford*, 673 S.W.3d at 250. This standard is intentionally deferential, as it seeks to "impinge[] upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319.

Thus, in looking at M.B's testimony in this case, we take her testimony as being true to give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* In so doing, we observe that "it is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction." *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) (citation and internal quotation marks omitted). Indeed, the victim's testimony requires no corroboration to sustain a conviction. *State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013) ("[I]t has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape."). As such, it is not part of our role, properly conceived, to "reevaluate the credibility of the witnesses or to revisit inconsistencies in the testimony." *State v. Murray*, No. M2021-00688-CCA-R3-CD, 2022 WL 17336522, at *5 (Tenn. Crim. App. Nov. 30, 2022), *perm. app. denied* (Tenn. Mar. 8, 2023).

Crediting M.B.'s testimony, as we must, we conclude that the record contains sufficient evidence to support the Defendant's convictions for aggravated sexual battery. M.B. testified that the Defendant touched her breasts when she was about ten years old. She also testified that the Defendant touched her "privates" over her clothes when she was between ten and twelve years old. The Defendant does not challenge that his touching of M.B. can be reasonably construed as being for the purpose of sexual arousal or gratification. As such, viewing the evidence in a light most favorable to the State, we conclude that a rational juror could find the essential elements of aggravated sexual battery in each count beyond a reasonable doubt.

With respect to the Defendant's convictions for rape of a child, M.B. testified that, when she was between ten and twelve years old, the Defendant pulled down her pants and "put his mouth down there where [she] pee[s]." She also testified that, on another occasion when she was between ten and twelve years old, the Defendant touched her breasts, exposed his penis, and put his mouth on her "private area." The Defendant does not assert that the State failed to prove the element of penetration, which includes cunnilingus. *See* Tenn. Code Ann. § 39-13-501(7); *State v. Falcon*, No. E2015-00935-CCA-R3-CD, 2016 WL 4409792, at *5 (Tenn. Crim. App. Aug. 17, 2016) (approving definition of "cunnilingus" as meaning "the sex act accomplished by placing the mouth or tongue on or in the vagina of another."), *perm. app. denied* (Tenn. Dec. 14, 2016). As such, viewing the evidence in a light most favorable to the State, we conclude that a rational juror could find the essential elements of rape of a child in each count beyond a reasonable doubt.

## B.  VIOLATION OF "THE SPIRIT" OF *BATSON*

The Defendant next argues that the trial court erred in randomly selecting and excusing an African American juror as an alternate juror at the end of the trial. The Defendant does not assert that the juror's selection was the product of purposeful discrimination. Instead, he alleges that the juror's selection violates the "spirit" of *Batson v. Kentucky*, 476 U.S. 79 (1986) and, in turn, violated his right to a fair trial.

As background for this issue, after the trial concluded, the trial court proceeded to select and excuse two alternate jurors. The court placed the names of all jurors in a box and then drew two names. One of the jurors chosen was African American.

After the selection, the trial court asked the Defendant whether there were "[a]ny issues from the defense?" The Defendant answered, "No," and he did not raise any further issues until his motion for a new trial. The Defendant now argues that this random exclusion process violated "the spirit" of *Batson* by selecting and excusing an African American juror as an alternate. We respectfully disagree.

6

In *Batson*, the United States Supreme Court recognized that "[p]urposeful racial discrimination in [the] selection of the venire violates a defendant's right to equal protection" as guaranteed by the Fourteenth Amendment to the United States Constitution. *Batson*, 476 U.S. at 86. However, as in other circumstances governed by the Equal Protection Clause, proof of purposeful intent to discriminate is required for a violation. Indeed, *Batson* itself made this point expressly: "As in any equal protection case, the burden is, of course, on the defendant who alleges discriminatory selection . . . to prove the existence of purposeful discrimination." *Batson*, 476 U.S. at 93 (citation and internal quotation marks omitted).

This qualification is important because the Fourteenth Amendment generally does not prohibit measures that have a disparate impact on an identifiable group, unless that impact is relevant to show a purposeful intent to discriminate against that group. *E.g.*, *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 43 (2012); *Hernandez v. New York*, 500 U.S. 352, 361-63 (1991). Thus, even if a decision to exclude a juror may correlate to race, that decision "does not implicate the Equal Protection Clause unless it is based on race. That is the distinction between disproportionate effect, which is not sufficient to constitute an equal protection violation, and intentional discrimination, which is." *Hernandez*, 500 U.S. at 375 (O'Connor, J., concurring).

The record in this case lacks any evidence of a purposeful intent to discriminate against any juror based upon his or her race. The trial court used a random selection procedure to designate individual jurors as alternates in a manner approved by the Rules of Criminal Procedure. *See* Tenn. R. Crim. P. 24(f)(2)(A). On its face, the random nature of the selection procedure precludes any finding of purposeful discrimination. Indeed, other courts have come to this same conclusion as well. *See State v. Lamb*, 110 N.E.3d 564, 584 (Ohio Ct. App. 2018) (holding that the "spirit of *Batson*" is not violated by "the random selection of alternate jurors, which may be eliminated by choosing a random number without regard to the race of the juror."); *State v. Brown*, 62 A.3d 1099, 1112 (R.I. 2013) (reasoning that "[t]he completely random process of selecting twelve names from a box requires no safeguards against discrimination," as "[t]his rule is color-blind. It does not discriminate between minorities and nonminorities"); *State v. Blackhoop*, 781 P.2d 599, 600 (Ariz. 1989) (rejecting analogy to *Batson* in random selection of alternate jurors at end of trial); *People v. Wilbon*, No. 263153, 2006 WL 3826728, at *3 (Mich. Ct. App. Dec. 28, 2006) (rejecting claim that random selection of only African American juror as an alternate at the end of trial violated *Batson*), *app. denied*, 478 Mich. 925 (Mich. 2007).

The Defendant has cited no case granting relief merely upon a claim that the "spirit" of *Batson* has been violated. We will not summon specters of a constitutional violation without proof of a purposeful intent to discriminate. The Defendant is not entitled to relief on this issue.

## C.   DEFENDANT'S WITNESSES

The final issue raised by the Defendant is that the trial court abused its discretion in failing to grant a mistrial and a motion for a new trial when none of the subpoenaed defense witnesses appeared in court to testify.  The Defendant claims there was a "manifest necessity" for a mistrial because the absence of subpoenaed witnesses denied him his fundamental right to a fair trial.  For its part, the State contends that the Defendant has failed to show that the testimony of the subpoenaed witnesses would have resulted in a different verdict.  Therefore, the State argues that the Defendant has failed to show that a manifest necessity warranted a mistrial in this case.  We agree with the State.

### 1.   Background

As background for this issue, the trial was scheduled to begin on Monday, November 7, 2022.  At this time, Ms. Sharp and the Defendant's daughter appeared to testify in an evidentiary hearing.  Ms. Sharp appeared again to testify during the trial two days later on November 9, 2022.

At trial, the Defendant subpoenaed several witnesses to testify, including Ms. Sharp, his daughter, and various records custodians needed to establish an alibi.  When Ms. Sharp appeared to testify, she said that her house had caught fire earlier that day, noting that she "left incense in [her] house."  The trial court observed that Ms. Sharp was distraught from the fire and determined that she was not competent to testify.  Ms. Sharp repeatedly asked the trial court to allow her to testify at that time and said that she would not return to testify later.  Nevertheless, with the Defendant's consent, the trial court released Ms. Sharp with instructions for her to return the next day.

Ms. Sharp did not return to court the next day.  The Defendant's other subpoenaed witnesses, including the Defendant's daughter and the records custodians, also failed to appear.  The Defendant then moved for a mistrial.  As part of his motion, defense counsel proffered his belief that his witnesses had been threatened, stating that there had been an altercation between the parties about a week before.  More specifically, defense counsel said that M.B.'s biological father accosted Ms. Sharp in the court building and threatened to kill her.  After the proffer, counsel called a victim-witness coordinator from the District Attorney General's Office.  This witness said that Ms. Sharp felt unsafe to come to court because of an altercation that occurred the previous Friday.  Defense counsel offered no proof with respect to any witness other than Ms. Sharp.

After hearing the proof and arguments, the trial court denied the motion for a mistrial, finding that "there was no showing of any proof of threats that have occurred after

8

Friday." The court also observed that Ms. Sharp appeared in court after the alleged threat and that the Defendant presented no other proof to support his allegations.

## 2.    Motion for a Mistrial

A mistrial should be declared only if there is a manifest necessity for such an action. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). "A manifest necessity exists when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial were not declared, and there is 'no feasible alternative to halting the proceedings.'" *State v. Pratt*, No. M2017-01317-CCA-R3-CD, 2018 WL 4005390, at *4 (Tenn. Crim. App. Aug. 20, 2018) (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)), *no perm. app. filed*. Stated differently, if there is a feasible and just remedy other than halting the proceedings, then no manifest necessity exists for a mistrial. *See State v. Smith*, 871 S.W.2d 667, 673 (Tenn. 1994).

Although "[t]he party seeking a mistrial has the burden of establishing its necessity," the "decision whether to grant a mistrial lies within the discretion of the trial court." *State v. Jones*, 568 S.W.3d 101, 126 (Tenn. 2019). An abuse of discretion "occurs when the trial court 'applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party.'" *State v. Johnson*, 401 S.W.3d 1, 21 (Tenn. 2013) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)).

In this case, the Defendant failed to show that a manifest necessity existed to declare a mistrial. First, the Defendant did not show that grounds existed for a mistrial. Although the Defendant's witnesses apparently failed to appear, he did not establish the reasons for their absence. Instead, the Defendant speculated that their collective absence was because of witness intimidation, but he offered no proof supporting this theory.[3] Indeed, with respect to Ms. Sharp specifically, the trial court observed that she appeared in court and asked to testify even after the alleged acts of intimidation occurred.

More importantly, the Defendant did not seek any lesser remedies to address his issues, though such remedies were available. For example, this Court has made clear that "the appropriate recourse when a party fails to comply with a subpoena, absent some showing of an adequate excuse for failure to comply, is a motion for contempt[.]" *State v. Johnson*, 538 S.W.3d 32, 54 (Tenn. Crim. App. 2017); Tenn. R. Crim. P. 17(g); Tenn. Code Ann. § 40-11-110(a). Alternatively, a party may seek a brief continuance to secure the presence of needed witnesses. *See Reese v. State*, 457 S.W.2d 877, 878 (Tenn. Crim. App.

---

[3]    Although the absence of the various records custodians were part of the motion for a mistrial, defense counsel did proffer why these witnesses in particular failed to appear. It is not obvious from the record that their absence was due to alleged witness intimidation.

1970) (holding that a claim was waived where a summoned witness did not appear, but the defendant did not request a continuance).

In this case, the Defendant did not seek a continuance to secure the presence of his witnesses. When the trial court asked, he rejected having a material witness warrant issued. He refused the State's offer to stipulate the Defendant's time records from work as a part of his alibi proof. And, the Defendant released one of his witnesses from the subpoena even after the Knoxville Police Department located that witness and offered to transport her to court.

Of course, the Defendant was not obligated to accept any of the assistance being offered. However, because remedies other than a mistrial were available to account for the issues presented, we cannot conclude that there was "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). As such, the trial court acted within its discretion in denying the Defendant's motion for a mistrial.

### 3.       Motion for a New Trial

In a variation on the theme, the Defendant also alleges that the trial court erred in denying his motion for a new trial based on his witnesses failing to appear at trial. We again respectfully disagree.

"Although an accused in a criminal trial has a constitutional right to the compulsory attendance of witnesses," the right "is not unlimited." *State v. Smith*, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982). Indeed, we have observed that "the constitutional right to compulsory process requires such process for, *and only for*, competent, material, and resident witnesses whose expected testimony will be admissible." *Id.*; *State v. Ostein*, 293 S.W.3d 519, 536 (Tenn. 2009) (emphasis added) (recognizing that the constitutional guarantee of compulsory process "applies only when the proposed witness is material.").

During the hearing on his motion for a new trial, the Defendant offered no evidence on this issue. For example, he did not present the testimony of any witness who was subject to a trial subpoena but failed to appear. Tenn. R. Crim. P. 33(c)(1). Alternatively, he did not offer any affidavits to establish how these witnesses would have testified had they been called at trial. *See* Tenn. R. Crim. P. 33(c)(2); *Bacon v. State*, 385 S.W.2d 107, 110 (Tenn. 1964) ("The defendant did not inform the Trial Judge of the nature of the testimony expected from these witnesses, and in his brief filed in this Court states he does not know what the testimony of these witnesses would have been. The first assignment of error is overruled."). And, the Defendant failed to show how the testimony from any of the missing witnesses would have impacted the proof that the jury considered at trial. *E.g.*, *State v. Caldwell*, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997).

Because the Defendant offered no proof to support his motion for a new trial, the record does not establish that testimony from any missing witness would have been material or credible. *See Smith*, 639 S.W.2d at 680; *State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) ("An assessment of the witnesses' credibility by the trial court is essential in order for the trial court to determine whether the evidence is likely to change the result of the trial."). The record also fails to show that the testimony from any missing witness likely would have changed the outcome of the trial. *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993); Tenn. R. App. P. 36(b). As such, we respectfully affirm the trial court's decision to deny the Defendant's motion for a new trial.

## CONCLUSION

In summary, we hold that the evidence presented at trial was sufficient to sustain the Defendant's convictions for aggravated sexual battery and rape of a child. We also hold that the Defendant is not entitled to relief under *Batson v. Kentucky* based on the trial court's selection of alternate jurors. Finally, we hold that the trial court acted within its discretion in denying the Defendant's motion for mistrial and his motion for a new trial. Accordingly, we respectfully affirm the judgments of the trial court.

_____
TOM GREENHOLTZ, JUDGE